IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02352-KLM

JODIE L. CARBAJAL,

     Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,

     Defendant.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

     This matter is before the Court[1] on the **Social Security Administrative Record**

[#10],[2] filed December 2, 2012, in support of Plaintiff's Complaint [#1] seeking review of the

decision of Defendant Acting Commissioner of the Social Security Administration

("Defendant" or "Commissioner") denying Plaintiff's claim for supplemental security income

benefits.  On January 28, 2014, Plaintiff filed an Opening Brief [#14] (the "Brief").  On March

6, 2014, Defendant filed a Response  [#17].  On March 19, 2014, Plaintiff filed a Reply

[#18].  The Court has jurisdiction to review the Commissioner's final decision under 42

U.S.C. § 405(g).  The Court has reviewed the entire case file and the applicable law and

is sufficiently advised in the premises.  For the reasons set forth below, the Court **AFFIRMS**

_____

     [1]  The parties consented to proceed before the undersigned for all proceedings pursuant
to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2.  *See* [#21, #22, #23].

     [2]  "[#10]" is an example of the convention the Court uses to identify the docket number
assigned to a specific paper by the Court's case management and electronic case filing system
(CM/ECF).  This convention is used throughout this Order.

the decision of the Commissioner.

## I. Background

Plaintiff filed this action on September 3, 2013, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for judicial review of an unfavorable decision by the Commissioner with respect to Plaintiff's claim for supplemental security income under Title XVI of the Act.

Plaintiff has completed high school.  Tr. 184.[3]  He has worked as a house painter, an automotive body repair worker, a self-employed entertainment promoter, a liquor store cashier, another cashier/checker, a dishwasher, and a tortilla maker.  Tr. 37-38, 185, 207-11.  Plaintiff alleges that he was terminated in 2010 from his most recent position as a painter because he arrived late to work, did not complete tasks, and took too long to complete tasks.  Tr. 39.

Plaintiff initially claimed an onset of disability on October 31, 2007.  Tr. 34, 157. Plaintiff's attorney, however, moved at the hearing before the Administrative Law Judge ("ALJ") to amend Plaintiff's alleged onset of disability to January 12, 2010.  Tr. 35.  The motion was granted.  Tr. 11.  Plaintiff was born in 1976 and thus was thirty-three years old on the amended date of the alleged onset of disability.  Tr. 157.  Some of Plaintiff's asserted medical issues included post-traumatic stress disorder ("PTSD"), major depressive disorder, panic disorder, antisocial personality disorder, sequalae of a gunshot wound to his left forearm, and left leg pain.[4]  Tr. 11.

---

[3]  The Court refers to the Transcript of the Administrative Proceedings, located at Docket Nos. 10, 10-1, 10-2, 10-3, 10-4, 10-5, 10-6, and 10-7, by the sequential transcript numbers instead of the separate docket numbers.

[4]  As discussed further below, not all of these medical problems are at issue in this Order.

A.     **Medical History**

Before his alleged onset of disability in 2010, Plaintiff did not seek treatment because he did not have medical insurance.  Tr. 29.  In addition, Plaintiff did not take medication.  Tr. 30.

When Plaintiff applied for disability, the State Disability Determination Services referred him to consultative examinations.  Tr. 232.  Psychologist Richard Madsen, Ph.D. ("Madsen"), saw Plaintiff on May 29, 2008, to evaluate his mental status.  Tr. 232.  Dr. Madsen noted that Plaintiff was dressed casually and that his grooming and hygiene were adequate.  Tr. 232.  Dr. Madsen also noted that Plaintiff has a history of drug and alcohol treatment and that Plaintiff began using alcohol at age 15 and illicit drugs at age 10.  Tr. 233.  Plaintiff stated that he has experienced, among other things, constant pain in his left toe, knee, and shoulder; depression; anxiety; and panic attacks.  Tr. 232.  In addition, Plaintiff stated that "he has to drink alcohol to sleep[]" and drinks four or five days a week.  Tr. 233.  Plaintiff further stated that he fights frequently with others, thinks that others talk about him, and "feels bad vibes from" others.  Tr. 232.  Dr. Madsen noted that Plaintiff's "symptoms of depression include irritability, hypersomnia, withdrawal, crying spells, anxiety, fatigue, sadness, mood swings, poor self-esteem, difficulty concentrating, low tolerance for frustration, decreased libido, decreased motivation, feelings of uselessness." Tr. 232.  Dr. Madsen further noted that Plaintiff's "[s]ymptoms of mania include racing thoughts, explosive temper, difficulty completing tasks, excess energy and agitation." Tr. 232.  Dr. Madsen stated that Plaintiff has suicidal thoughts and attempted suicide eight years prior.  Tr. 232.

On examination, Dr. Madsen found that Plaintiff "is oriented to person, place and

time[,]" and he can "recall the year, the month, the day of the month, the day of the week, and the name of the President." Tr. 233. Plaintiff's "affect is blunted and consistent with a depressed mood," and his "[t]hought processes are nonpsychotic." Tr. 233. He spoke in a logical and relevant manner, but his "[m]otor behavior and speech were slow." Tr. 233. Dr. Madsen did not find evidence of suicidal or homicidal ideation. Tr. 233.

Dr. Madsen made several findings concerning Plaintiff's ability to count, recall, and perform basic arithmetic. Tr. 233. Plaintiff "could count from 1 by 3's to 40 making one error." Tr. 233. His "[s]hort term memory, as measured by digit span, is average." Tr. 233. He could "recall 3 of 3 objects on immediate recall, and 3 of 3 after 5 minutes;" "his Social Security number, date of birth, age, address, and phone number accurately;" and "6 forward and 4 backward." Tr. 233. "His ability to do arithmetic functions in his head is impaired." Tr. 233. "He was able to calculate the price of 6 objects given the price 1 being .25 cents[] [but] [h]e was unable to do any[] more difficult calculations." Tr. 233.

Dr. Madsen diagnosed Plaintiff with major depression, recurrent moderate; agoraphobia with panic; chronic PTSD; alcohol abuse; and impaired intellectual functioning. Tr. 234. Dr. Madsen gave Plaintiff a Global Assessment of Functioning ("GAF") score of 50, indicating severe symptoms or limitations. Tr. 234; Am. Psychiatric Ass'n, Diagnostic & Statistical Manual 34 (4th ed. text rev. 2000) ("DSM VI").[5] Dr. Madsen explained that

---

[5] "The GAF is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning." *Langley v. Barnhart*, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (citing DSM VI at 32). A GAF score between 51 and 60 indicates "'moderate symptoms,' such as a flat affect, or 'moderate difficulty in social or occupational functioning.'" *Wilson v. Astrue*, 602 F.3d 1136, 1142 n.3 (10th Cir. 2010) (citing DSM-IV at 34). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, inability to keep a job)." *Lee v. Barnhart*, No. 03-7025, 2004 WL 2810224, at *3 (10th Cir. Dec. 8, 2004) (quoting DSM IV at 34). The Tenth Circuit has explained

Plaintiff "isolates himself at home[]" and "[h]e does not go out much, other than to get his son or go to a doctor's appointment."  Tr. 235.  Dr. Madsen further noted that Plaintiff's "girlfriend [does] most of the work around the house[]" and that "[d]epression interferes with his concentration, motivational levels and energy level."  Tr. 235.  Dr. Madsen opined that Plaintiff "should be able to handle his own funds."  Tr. 235.  Dr. Madsen concluded that Plaintiff "would have difficulty maintaining a regular work schedule, focusing and concentrating on work, relating to peers, coworkers, supervisors, and the general public."  Tr. 235.

On June 21, 2008, Troy Glaser, D.O. ("Glaser"), examined Plaintiff.  Tr. 237.  Plaintiff claimed that "he drinks 8-12 beers on a weekend."  Tr. 238.  Plaintiff also claimed that he does not use illicit drugs.  Tr. 238.  Dr. Glaser diagnosed Plaintiff with left arm and leg pain and anxiety.  Tr. 240.  Dr. Glaser noted that Plaintiff's left arm pain might "affect [Plaintiff's] grip a little bit but his examination was not consistent for where his gunshot wound was."  Tr. 240.  Dr. Glaser found that Plaintiff had no restrictions on his ability to stand, walk, or sit during an eight-hour workday.  Tr. 240.  Dr. Glaser recommended that Plaintiff be restricted to lifting with his left hand "10 pounds frequently and maybe 20 pounds occasionally."  Tr. 240.  Dr. Glaser assessed that Plaintiff had no postural or manipulative limitations.  Tr. 241.  Dr. Glaser noted that Plaintiff's ability to perform would be limited if

---

that it is not necessary for the ALJ to specifically mention or adopt every GAF score in his decision.  *See Luttrell v. Astrue*, 453 F. App'x 786, 791-92 (10th Cir. 2011); *Butler v. Astrue*, 412 F. App'x 144, 147 (10th Cir. 2011); *Holcomb v. Astrue*, 389 F. App'x 757, 759 (10th Cir. 2010) (holding that GAF scores taken alone do not establish an impairment serious enough to preclude an ability to work).  In addition, the Social Security Commission has declined to endorse the use of GAF scores in social security disability programs because they have no direct correlation to the severity requirements of the Listings for mental disorders.  *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury ("Revised Med. Criteria"), 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000); *see infra* Section II.A. (further explaining the "Listings").

he were "around a lot of people with his anxiety."  Tr. 241.

On April 24, 2009, David R. Benson, Ph.D. ("Benson"), examined Plaintiff.  Tr. 242.  Dr. Benson reviewed the report concerning Dr. Madsen's May 29, 2008 examination of Plaintiff.  Tr. 242.  Dr. Benson noted that Plaintiff "was appropriate and respectful and casually dressed."  Tr. 242.  Although Plaintiff "rarely leaves the house," he stated that he took his son to school in the morning.  Tr. 244.  Plaintiff stated that "he has difficulty doing quiet things or sitting quietly and spends a lot of time on the computer with various activities."  Tr. 244.  Dr. Benson noted that Plaintiff can "carry out all activities of daily living."  Tr. 244.  Plaintiff stated that he cooks "with the assistance of his girlfriend who is frequently there."  Tr. 244.  Plaintiff reported that "he drinks between 6 to 12 beers in a day now" and "has been drinking daily for 5 or 6 years."  Tr. 244.

On examination, Dr. Benson found that Plaintiff could recall three words initially but not after minutes had elapsed, could recall four digits forward and backwards, and could spell "house" backwards.  Tr. 245.  Plaintiff told Dr. Benson that "he could not do serial 7's or 3's."  Tr. 245.  Dr. Benson diagnosed Plaintiff with PTSD; panic disorder with agoraphobia; alcohol dependency; major depression, recurrent; and antisocial personality traits.  Tr. 245.  Dr. Benson gave Plaintiff a GAF score of 45.  Dr. Benson found that Plaintiff "has a limited ability to understand and remember detailed instructions;" "a limited ability to perform activities within a schedule and maintain regular attendance and be punctual within a customary tolerance;" and "a markedly limited ability to interact appropriately with the general public."  Tr. 246.  Dr. Benson "strongly recommended" that Plaintiff seek treatment.  Tr. 246.

On May 18, 2010, Brett Valette, Ph.D. ("Valette"), examined Plaintiff.  Tr. 254.  Dr.

-6-

Valette reviewed the reports of Dr. Madsen and Dr. Benson.  Tr. 256.  Plaintiff reported to

Dr. Valette that after he takes his son to school, he will watch television, nap, or go to the

residence of his girlfriend.  Tr. 254.  In the evening, Plaintiff stated that he spends time with

his son.  Tr. 254.  In addition, Plaintiff said that he socializes with friends.  Tr. 255.  Plaintiff

could dress himself, bathe himself, do laundry, vacuum, cook, handle his finances, and

drive.  Tr. 254-55.  Plaintiff asserted that "he has not had any alcohol since September

2009."  Tr. 255.  Plaintiff reported that "he has not done any drugs since he was 12 years

old."  Tr. 255.  In addition Plaintiff reported that "[h]e has never been in a psychiatric

hospital[];" "[h]e does not have a physician[];" and "[h]e is not in any therapy."  Tr. 255.

Dr. Valette examined Plaintiff and found him to be cooperative but vague in his

responses.  Tr. 255.  Dr. Valette expressed concern "about [Plaintiff's] effort on the testing

. . . [and] the information he gives [Dr. Valette]."  Tr. 255.  Plaintiff could recall three items,

and "[a]fter five minutes, he could recall two items."  Tr. 255.  Plaintiff could count by 3 but

not by 7.  Tr. 255.  Dr. Valette diagnosed Plaintiff with PTSD, major depression, antisocial

personality disorder, knee pain, and left arm pain.  Tr. 256.  Dr. Valette gave Plaintiff a GAF

score range of 60-65.  Tr. 256.

On June 7, 2010, Mark Suyeishi, Psy.D ("Suyeishi"), reviewed Plaintiff's medical

record and evaluated the evidence therein.  Tr. 56-64.  Dr. Suyeishi completed a

Psychiatric Review Technique (PRT) and found that Plaintiff's restriction of activities of daily

living was mild; his difficulties in maintaining social functioning were moderate; his

difficulties in maintaining concentration, persistence or pace were mild; and he had no

repeated episodes of extended-duration decompensation.  Tr. 60.  Dr. Suyeishi also

completed a Physical Residual Functional Capacity Assessment and found, among other

things, that Plaintiff had limitations with regard to his social interactions because his "alleged PTSD has created more withdrawn/isolative behaviors; he "has the mental ability to do work not involving significant complexity or judgement [sic];" and he "can do work requiring up to 3 months time to learn techniques, acquire information and develop facility needed for an average job performance." Tr. 62-64.  Dr. Suyeishi concluded that "[u]nless [Plaintiff's] anxiety lessens he should have limited to no interaction with the public." Tr. 64.

On September 13, 2011, Cindy Stegman, FNP, examined Plaintiff at Pueblo Community Health Center ("Pueblo Health"). Tr. 270-272.  Plaintiff reported that he drinks six beers a day.  Tr. 271.  Ms. Stegman noted that he "has self tattooed himself quite a bit in his garage . . . ." Tr. 271.  On examination, Ms. Stegman expressed concern "about possible hepatic involvement, both from the multiple tattoos as well as from his 6-pack of alcohol a day." Tr. 271.

On November 11, 2011, Dr. Madsen examined Plaintiff a second time at the request of Plaintiff's attorney. Tr. 261.  First, Dr. Madsen conducted a psychological evaluation of Plaintiff.  Tr. 261-65.  Dr. Madsen reviewed his previous report and Dr. Benson's report. Tr. 263.  Plaintiff reported that he lived with his 14-year-old son, and that his son helped him. Tr. 261-62.  Plaintiff "drives a car, does self care, prepares meals, does laundry, [and] grocery shopping." Tr. 262.  Plaintiff stated that "he stays pretty much to himself;" "[d]oes not have many friends;" and "[d]oes not go out to do much." Tr. 261.  Plaintiff asserted that he uses alcohol and "has not used any drugs for several years." Tr. 263.  On examination, Dr. Madsen found that Plaintiff's "[a]ffect is consistent with an anxious depressed mood[]" and that he has nonpsychotic thought processes. Tr. 263.  Plaintiff "appears restless[]" and he "[h]as difficultly sitting still." Tr. 263.  He "was unable to count from 1 by 3's to 40

accurately, making 2 errors." Tr. 263. "He was able to recall 4 of 5 objects on immediate recall and 3 of 5 after 5 minutes." Tr. 263. Dr. Madsen diagnosed Plaintiff with major depressive disorder, recurrent moderate; chronic PTSD; panic disorder with agoraphobia; and alcohol abuse, episodic. Tr. 264. Dr. Madsen gave Plaintiff a GAF score of 50. Tr. 264.

Second, Dr. Madsen completed a Residual Functional Capacity Evaluation (Mental) concerning Plaintiff. Tr. 266.-67. In this evaluation, Dr. Madsen determined Plaintiff's degree of limitation in his understanding and memory; sustained concentration and persistence; social interaction; and adaptation. Tr. 266-67. He opined that Plaintiff has a marked degree of limitation with regard to eight of the twenty categories of limitation, a moderate degree of limitation with regard to ten of the categories, and a slight degree of limitation with regard to two of the categories. Tr. 266-67.

On December 22, 2011, Ms. Stegman examined Plaintiff a second time at Pueblo Health. Tr. 268-72. Plaintiff reported that he was experiencing increased left knee pain along with swelling and instability, as well as increased anxiety. Tr. 269. Ms. Stegman prescribed him Zoloft and Xanax for his anxiety disorder and scheduled a follow-up examination for his anxiety disorder. Tr. 269. Ms. Stegman referred him to Pueblo Health's mental health department so that he could receive counseling for his PTSD. Tr. 269.

On two separate occasions in early 2012, Plaintiff presented at Pueblo Health with hives and a sore on his left arm.[6] Tr. 273-81. On January 13, 2012, Matthew E. Bowles,

---

[6] He had also done so once in early 2011, when Pamela S. Parks, M.D., examined and treated Plaintiff's hives. Tr. 282.

M.D., examined and treated Plaintiff's sore.  Tr. 280.  On February 12, 2012, Robert R. Westeremeyer, M.D., examined Plaintiff's sore and removed a "small foreign body," which may have been "a small flake of metal from [Plaintiff's] previous gunshot wound."  Tr. 276.

On April 10, 2012, Ms. Stegman examined Plaintiff a third time.  Plaintiff reported that he "ran out" of the Zoloft previously prescribed by Ms. Stegman.  Tr. 287.  "He thought that was all he was supposed to take; he did not get it refilled."  Tr. 287.  Plaintiff also reported that he takes Xanax daily and it "really help[s] his stressors."  Tr. 287.  On examination, Ms. Stegman noted that Plaintiff has "a couple of granulated areas on his left forearm distal to his gunshot wound[]" and these areas "appear to be healing."  Tr. 287.  Ms. Stegman prescribed Effexor and Xanax.  Tr. 287.  Ms. Stegman recommended counseling for Plaintiff.  Tr. 287.

On August 13, 2012, Kendra Emery, D.O. ("Emery"), examined Plaintiff.  Tr. 247, 252.  Although Plaintiff reported that "he quit abusing alcohol in 2005," he stated that he "uses alcohol when he has access to it."  Tr. 248.  In addition, Plaintiff stated that "he used marijuana daily for one year," quitting at age 14.  Tr. 248.  After examination, Dr. Emery diagnosed Plaintiff with anxiety, PTSD, knee pain, and restricted function, extension, and fine motor movements of the left hand.  Tr. 251.  Dr. Emery "highly recommend[ed] a psychiatric evaluation."  Tr. 251.  Dr. Emery found that Plaintiff, during an eight-hour workday, should be able to stand for four hours with breaks, and could walk or sit for the entire eight hours.  Tr. 251.  Dr. Emery noted that "[t]here are manipulative limitations, frequent mobility with the left hand, gripping, reaching, pulling, grasping, handling, and feeling."  Tr. 251.  Dr. Emery found that "[Plaintiff] has a difficult time communicating with people and is afraid to be around others[.]"  Tr. 251.  Dr. Emery recommended employment

for Plaintiff that does not require standing for the entire time nor fine coordination of the left hand.  Tr. 251.

**B.    Application to the Social Security Administration**

On January 13, 2010, Plaintiff filed a Title XVI application for supplementary security income.  Plaintiff alleged an onset disability date of October 31, 2007.[7]  In a disability report that Plaintiff completed around the time of his application, Plaintiff reported that he was five feet, eleven inches tall and weighed one hundred and seventy-four pounds.  Tr. 183.  Plaintiff alleged that he has left arm and leg injuries as well as PTSD.  Tr. 183.  Plaintiff asserted that he stopped working on June 15, 2001, because of his conditions.  Tr. 183.

The Commissioner denied Plaintiff's application at the initial level.  Tr. 67-69.  Plaintiff therefore requested a hearing before an ALJ of the Social Security Administration (the "SSA").  Tr. 70-71.  The ALJ granted Plaintiff's request.  Tr. 73-74.  On July 27, 2011, the ALJ conducted an initial hearing at which he informed Plaintiff that Plaintiff may seek counsel to represent him.  Tr. 27-31.  The ALJ scheduled another hearing so that Plaintiff could attend with counsel.  Tr. 30-31.  The ALJ conducted the second hearing on June 19, 2012, and Plaintiff attended with counsel.  Tr. 32-55.

**C.    The ALJ Hearing**

Plaintiff and Nora Dunn, an impartial vocational expert (the "VE"), testified at the hearing.  Tr. 35-54.  The ALJ first questioned Plaintiff.  Tr. 35-49.  Plaintiff testified that he last worked for a painting company.  Tr. 37.  He had worked at the painting company during the previous year for "close to two months."  Tr. 37-38.  Plaintiff testified that he was

---

[7]  As previously noted, Plaintiff's attorney moved at the hearing before the ALJ to amend Plaintiff's alleged onset of disability to January 12, 2010.  Tr. 36.

terminated from his job because he "wasn't going on time[;]" "wasn't finishing the jobs"; "and it was taking [him] too long to do the work." Tr. 39.

Regarding his medical treatment, Plaintiff testified that he has received medication from Pueblo Health, including Xanax, and is on the hospital's waiting list for psychological counseling. Tr. 46-47. He claimed that the medication "calms [him] down quicker [sic] than if [he] wasn't [sic] on it, but it doesn't take the full effect away." Tr. 47. He asserted that "[a]nything could cause [him] to get a panic attack or anxiety attack[.]" Tr. 47. He alleged that he has attacks on a daily basis. Tr. 47. He described how seeing a car parked "too long" in front of his house triggers an attack. Tr. 47. He claimed that these attacks affect his ability to be around people, and, as an example, he explained that he prefers to shop in the early hours of the morning in order to avoid others. Tr. 47.

Regarding his physical capabilities, Plaintiff described his injuries and corresponding limitations. Tr. 44. Plaintiff asserted that the physical damage caused by a gunshot to his left arm during a home invasion robbery still continues to affect him. Tr. 44. Plaintiff claimed that he can lift twenty-to-thirty pounds with his left arm. Tr. 45. He explained that he "use[s] [his] right to help carry the stuff in [his] left arm." Tr. 45. He also has difficulty gripping with his left hand. Tr. 46. In addition, Plaintiff described the left knee pain he has experienced since a car accident in 1999. Tr. 45. Plaintiff alleged that, because of the knee injury, he can only stand for half an hour at a time. Tr. 45. After standing for half an hour, he needs to sit for fifteen to twenty minutes to recover. Tr. 46.

Regarding his mental and emotional condition, Plaintiff testified that he drinks "three or four times a week." Tr. 41. When he drinks, he usually drinks to the point of intoxication and has done so for ten years. Tr. 42. Plaintiff testified that the medication he was

prescribed helps but does not cure his panic attacks and anxieties.  Tr. 43.  Plaintiff claimed that his panic attacks and anxieties stem from the shooting.  Tr. 43.  Plaintiff also alleged that his mental and emotion condition has gradually worsened since the shooting.  Tr. 43.

Regarding his social interactions and daily life, Plaintiff testified that he lives with his fifteen-year-old son, with whom he has lived since his son was six.  Tr. 36.  Plaintiff stated that he takes care of his son with assistance from his son's maternal grandmother.  Tr. 36.  Plaintiff asserted that he has an automobile driver's license and drives a motor vehicle.  Tr. 37.  Plaintiff claims that he has not trusted anyone since the shooting.  Tr. 43.  Plaintiff testified that he spends time with his son's maternal grandmother, his sister, his father, and his girlfriend.  Tr. 43-44.  Plaintiff asserted that he has dated his current girlfriend for eight months and that his last relationship lasted for five years.  Tr. 44.

Regarding his work history, Plaintiff described his most recent employment with the painting company.  Tr. 37-41.  Plaintiff testified that he earned minimum wage and worked full time.  Tr. 38.  Plaintiff testified that he painted his employer's rental properties.  Tr. 39.  Plaintiff discussed the last place he painted, a house on a busy street.  Tr. 39-41.  Plaintiff stated that he would not go to the house and paint because working on a busy street triggered his anxiety and paranoia.  Tr. 40-41.

The ALJ next questioned the VE.  Tr. 49-54.  Having reviewed the record, the VE categorized Plaintiff's prior work as: (1) tortilla maker, consisting of light work with a Specific Vocational Preparation skill level ("SVP") of three; (2) liquor store cashier, consisting of heavy work with a SVP of 4; (3) automotive body repair helper, consisting of medium work with a SVP of 2; (4) cashier/checker, consisting of light work with a SVP of 3; (5)

dishwasher, consisting of medium work with a SVP of 2; (6) house painter, consisting of medium work with a SVP of 7; and (7) self-employed entertainment promoter, consisting of light work with a SVP of 7.  Tr. 49-50.

The ALJ then asked the VE about the vocational opportunities for a hypothetical person who has the same education and vocational background as Plaintiff; "can function at the light exertional level;" can occasionally perform work requiring fine coordination with his left hand; can perform work "at the low end of semi-skilled;" can work in environments with "decreased interpersonal contact with the general public[];" and can interact face-to-face on a "probably less than occasional" basis.  Tr. 50-51.  Having provided those limitations, the ALJ then asked the VE "[g]iven that hypothetical, could such a person perform [Plaintiff's] past relevant work as actually performed or generally performed?"  Tr. 51.  The VE replied in the negative.  Tr. 51.

The ALJ then asked the VE whether there would be "other work in either region[al] or national economies that could be performed[,] and if so, would [the VE] share with [the Court] the skill level and the exertional level?"  Tr. 51.  The VE responded that she needed time to consult her database, and the Court went in recess while the VE did so.  Tr. 51.  After the recess, the VE testified that she found "some jobs that would fit [the ALJ's] hypothetical."  Tr. 52.  The VE explained that the hypothetical person could work as a brake adjuster, which consists of light work, has a SVP of 2, has 299 employment opportunities in Colorado, and 15,803 employment opportunities nation-wide; a car wash attendant, which consists of light work, has a SVP of 2, has 729 employment opportunities in Colorado; and 46,372 employment opportunities nation-wide; and a gate guard, which consists of light work, has a SVP of 3, has 1,940 employment opportunities in Colorado,

and has 127,890 employment opportunities nation-wide.  Tr. 52.  In addition, the VE noted that her database "doesn't necessarily speak to alternating standing and walking, but these jobs [of brake adjuster, car wash attendant, and gate guard] do have that flexibility."  Tr. 52.

Next, Plaintiff's attorney questioned the VE.  Tr. 52.  First, Plaintiff's attorney asked the VE "how much reaching, handling, and fingering is required of a brake adjuster?"  Tr. 52.  The VE replied "that a brake adjuster has frequent reaching, frequent handling, and occasional fingering."  Tr. 52-53.  Plaintiff's attorney asked the VE to discuss those limitations with regard to working as a gate guard and a car wash attendant.  Tr. 53.  The VE stated that "gate guard is rated at occasional [reaching], occasional [handling], and not present for the fingering[]"; and "car wash attendant is rated at frequent [reaching], frequent [handling], and occasional [fingering]."  Tr. 53.

Then, Plaintiff's attorney asked the VE to determine the vocational opportunities for a hypothetical individual "who had a limited ability to understand and remember detailed instructions; a limited ability to perform activities within a schedule and maintain regular attendance and be punctual; and also a marked limitation in the ability to interact with the general public."  Tr. 53.  The VE stated that the previous jobs she had identified would be appropriate for an individual with the limitations the Plaintiff's attorney described.  Tr. 53.

Next, Plaintiff's attorney asked for vocational opportunities for a hypothetical individual "who had a moderate limitation in the ability to complete a normal work day or work week without interruption from psychologically based symptoms and also a moderate impairment in the ability to perform activities within a schedule and maintain regular attendance and be punctual[.]"  Tr. 53-54.  The VE asserted that there would be vocational opportunities.  Tr. 54.  When asked by the Plaintiff's attorney whether there would be any

vocational opportunities if the limitations were marked rather than moderate, the VE answered in the negative. Tr. 54.

Lastly, Plaintiff's attorney asked if there were vocational opportunities for a hypothetical "individual who only had a moderate limitation in understanding and memory, sustained concentration and persistence, social interaction, and adaptation[.]" Tr. 54. The VE replied that there were vocational opportunities. In response to whether there would be such opportunities if those limitations were marked, the VE responded in the negative. Tr. 54.

## D. The Commissioner's Decision

On June 25, 2012, the ALJ issued an unfavorable decision.[8] Tr. 6-20. The ALJ found that Plaintiff had not engaged in substantial gainful activity ("SGA") during the relevant period and that he had six severe impairments: (1) PTSD; (2) major depressive disorder; (3) panic disorder; (4) antisocial personality disorder; (5) sequalae of a gunshot wound to the left forearm; and (6) left leg pain. Tr. 11. The ALJ found that Plaintiff's severe impairments, individually or in combination, did not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). Regarding Plaintiff's residual functional capacity ("RFC") to perform work-related activities, the ALJ considered the entire record and found that Plaintiff was capable of light work, as defined in 20 C.F.R. §§ 416.967(b) "except [Plaintiff] can walk for 8 out of 8 hours and stand for 4 out of 8 hours, but needs to change positions between these postures every 30 minutes; [Plaintiff] can sit for 8 out of 8 hours; can frequently handle and feel; can occasionally finger

---

[8] For an explanation of the five-step process used by the ALJ, see Section II.A. below.

with the left hand for work requiring fine coordination; can perform work at the low end of

semi-skilled work; and has decreased interpersonal contact with the general public, such

that he can engage in face-to-face contact (as opposed to telephonic contact) on a less

than occasional basis." Tr. 13. In addition, the ALJ found that Plaintiff "is unable to perform

any past relevant work," but that "there are jobs that exist in significant numbers in the

national economy that [Plaintiff] can perform." Tr. 18-19 (citing 20 C.F.R. 416.965, 20

C.F.R. 416.969(a)). Finally, the ALJ found that Plaintiff "has not been under a disability,

as defined in the Social Security Act," since the filing of his Social Security application. Tr.

20.

Plaintiff appealed the ALJ's decision. Tr. 151. The Appeals Council denied

Plaintiff's request for review, thereby making the ALJ's decision the final decision of the

Commissioner. Tr. 1-5. Plaintiff then timely sought judicial review of the decision by the

Court. *See Compl.* [#1].

## II. Standard of Review and Applicable Law

Pursuant to the Social Security Act:

[T]he [SSA] is authorized to pay disability insurance benefits and
Supplemental Security Income to persons who have a "disability." A person
qualifies as disabled, and thereby eligible for such benefits, "only if his
physical or mental impairment or impairments are of such severity that he is
not only unable to do his previous work but cannot, considering his age,
education, and work experience, engage in any other kind of substantial
gainful work which exists in the national economy."

*Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003) (quoting 42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B)). Under the applicable legal standard, a claimant is disabled if he or she

is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment . . . which has lasted or can be expected to last

-17-

for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); *see also*

*Wall v. Astrue*, 561 F.3d 1048, 1051 (10th Cir. 2009) (quoting 20 C.F.R. § 416.905(a)). The

existence of a qualifying disabling impairment must be demonstrated by "medically

acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A).

The Court reviews a final decision by the Commissioner by examining the

administrative record and determining "whether the [ALJ's] factual findings are supported

by substantial evidence in the record and whether the correct legal standards were

applied." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). However, the Court

"may neither reweigh the evidence nor substitute [its] judgment for that of the agency."

*Harper v. Colvin*, 528 F. App'x 887, 890 (10th Cir. 2013) (quoting *Barnett v. Apfel*, 231 F.3d

687, 689 (10th Cir. 2000)). In other words, the Court does not reexamine the issues *de*

*novo. Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F. 3d 739, 741 (10th Cir. 1993).

Thus, even when some evidence could support contrary findings, the Court "may not

displace the agency's choice between two fairly conflicting views," even if the Court may

have "made a different choice had the matter been before it *de novo*." *Oldham v. Astrue*,

509 F.3d 1254, 1257-58 (10th Cir. 2007).

## A.     Legal Standard

The SSA uses a five-step framework to determine whether a claimant meets the

necessary conditions to receive Social Security benefits. *See* 20 C.F.R. § 416.920. The

claimant bears the burden of proof at steps one through four, and if the claimant fails at any

of these steps, consideration of any subsequent steps is unnecessary. *Williams v. Bowen*,

844 F.2d 748, 750 (10th Cir. 1988) ("If a determination can be made at any of the steps that

a claimant is or is not disabled, evaluation under a subsequent step is not necessary.").

The Commissioner bears the burden of proof at step five. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

Step one requires the ALJ to determine whether a claimant is "presently engaged in substantial gainful activity." *Wall*, 561 F.3d at 1052 (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004)). If not, the ALJ then considers, at step two, whether a claimant has "a medically severe impairment or impairments." *Id.* "An impairment is severe under the applicable regulations if it significantly limits a claimant's physical or mental ability to perform basic work activities." *Wall*, 561 F.3d at 1052 (citing 20 C.F.R. § 404.1521). Next, at step three, the ALJ considers whether a claimant's medically severe impairments are equivalent to a condition "listed in the appendix of the relevant disability regulation," *i.e.*, the "Listings." *Wall*, 561 F.3d at 1052 (quoting *Allen*, 357 F.3d at 1142). "If a claimant's impairments are not equivalent to a listed impairment, the ALJ must consider, at step four, whether a claimant's impairments prevent her from performing her past relevant work." *Wall*, 561 F.3d at 1052 (citing *Allen*, 357 F.3d at 1142). "Even if a claimant is so impaired, the agency considers, at step five, whether she possesses the sufficient residual functional capability to perform other work in the national economy." *Id.*

## B.   Substantial Evidence

An ALJ must consider all evidence and explain why he or she finds a claimant not disabled. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). However, the ALJ need not specifically "reference everything in the administrative record." *Wilson*, 602 F.3d at 1148. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1140 (internal quotation marks omitted). "It requires more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d

1080, 1084 (10th Cir. 2007). A decision by the ALJ is not based on substantial evidence "if it is overwhelmed by other evidence in the record . . . ." *Grogan v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005). In other words, the Court's determination of whether the ALJ has supported his or her ruling with substantial evidence "must be based upon the record taken as a whole." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). Further, evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision denying him supplemental social security income benefits. *Brief* [#14] at 2. Specifically, Plaintiff argues that the ALJ erred by: (1) improperly weighing the opinion evidence; 2) failing to properly assess the opinion of Dr. Valette; 3) not accounting for the limitations given weight in the RFC finding; and 4) improperly elevating Dr. Suyeishi's opinion. *Id.* at 18-19.

### A. Whether the ALJ Improperly Weighed the Opinion Evidence

### 1. Dr. Madsen and Dr. Benson

Plaintiff argues that the ALJ erred in connection with weighing the opinions of Dr. Madsen and Dr. Benson.[9] *Id.* at 24-31. The Court may not reweigh the evidence or substitute its judgment for that of the ALJ and the Commissioner. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005); *White v. Barnhart*, 287 F.3d 903, 905, 908, 909 (10th Cir. 2001). However, the conclusions reached by the ALJ must be reasonable and consistent

---

[9] Although Plaintiff also here briefly mentions the opinion of Dr. Valette, he further states that "[t]his point will be discussed in detail in the next issue." *Brief* [#14] at 31. The Court therefore leaves discussion of the ALJ's treatment of Dr. Valette's opinion to the next part of its analysis.

with the evidence.  *See Glenn v. Shalala*, 21 F.3d 983, 988 (10th Cir. 1994) (the court must affirm if, considering the evidence as a whole, there is sufficient evidence which a reasonable mind might accept as adequate to support a conclusion).   An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing 20 C.F.R. § 401.1527(d)).   Treating physicians' opinions are generally given controlling weight. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).   Here, however, the parties agree that there is no opinion from a treating physician in the record. *Brief* [#14] at 28; *Response* [#17] at 15.

Even when a medical opinion is not given controlling weight, the inquiry does not end. *Watkins*, 350 F.3d at 1300.  Such an opinion is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § . . . 416.927." *Id.*  Those factors are: (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.   *Id.* at 1301; 20 C.F.R. § 416.927(d)(2–6); *see also  Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing *Goatcher v. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)).  Although the above factors are to be considered in weighing medical opinions, the Court does not insist on a factor-by-factor

analysis so long as the "ALJ's decision [is] 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Oldham*, 509 F.3d at 1258 (quoting *Watkins*, 350 F.3d at 1300).

The Social Security Commission has also noted that "individuals with mental impairments can provide much useful information and often are the best sources of information about their impairments." Revised Med. Criteria, 65 Fed. Reg. 50746, 50764. The practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements. *Thomas v. Barnhart*, 147 F. App'x 755, 759-760 (10th Cir. 2005); *Miranda v. Barnhart*, 205 F. App'x 638, 641 (10th Cir. 2005). A psychological opinion may rest either on observed signs and symptoms or on psychological tests. *Langley v. Barnhart*, 373 F.3d 1116, 1122 (10th Cir. 2004); *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004). The ALJ cannot reject a psychologist's opinion solely for the reason that it was based on a claimant's responses, because such rejection impermissibly substitutes the ALJ's judgment for that of the psychologist. *Thomas*, 147 F. App'x at 760; *Miranda*, 205 F. App'x at 641.

Plaintiff's alleged onset date of disability was January 12, 2010. Tr. 35. The ALJ stated that he gave the May 29, 2008 opinion of Dr. Madsen little weight because it occurred long before Plaintiff's alleged onset date of disability, because it was based on a single exam, because Dr. Madsen's perspective of Plaintiff's functioning at that time was "exceedingly narrow," and because it was not useful, "as stating that one has difficulties in an area does not provide much insight into the severity and frequency of such difficulties." Tr. 17, 232.

The ALJ gave the April 24, 2009 opinion of Dr. Benson little weight because Dr. Benson only examined Plaintiff once and because the only record reviewed by Dr. Benson was Dr. Madsen's 2008 opinion that was already nearly a year old, both of which demonstrated to the ALJ that Dr. Benson's opinion was "based on a very narrow perspective of the claimant's ability to function." Tr. 17-18. The ALJ emphasized that a broader longitudinal perspective is preferable when it comes to evaluating a person's mental impairment, because such a perspective more accurately reflects variations in mental status. Tr. 18. The ALJ also stated that Dr. Benson's opinion was not clearly explained in that, for example, Dr. Benson cited Plaintiff's anxiety but failed to cite any specific mental status exam findings or explain how other evidence would support his opinion. Tr. 18. The ALJ also stated that Dr. Benson's opinion was not consistent with Plaintiff's minimal treatment, apparent improvement with treatment, and daily living activities. Tr. 18.

The ALJ stated that he gave Dr. Madsen's second opinion, from his November 11, 2011 examination of Plaintiff, little weight because Dr. Madsen did not review the opinion of Dr. Valette, "who noted inconsistencies in the claimant's allegations," thus demonstrating that Dr. "Madsen's "perspective on the claimant's presentation is not complete and somewhat skewed." Tr. 17. The ALJ further noted that Dr. Madsen's opinion was not well explained, "and really his endorsement of marked limitations is not explained at all." Tr. 17. The ALJ found that the opinion was not supported by the exam findings, "which, while showing some problems, do not support the magnitude of limitation [Dr. Madsen] endorses." Tr. 17. He stated that the opinion was not supported by or consistent with Dr. Madsen's 2008 report, with Dr. Benson's report, or with Plaintiff's claimed daily living

activities.  Tr. 17.  The ALJ thus found that the opinion was poorly explained and not consistent with the record as a whole.  Tr. 17.

The Court finds that the ALJ has provided reasoning "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the . . . source's medical opinion and the reasons for that weight."  *Oldham*, 509 F.3d at 1258.  Although Plaintiff disagrees with the ALJ's conclusion that Dr. Madsen's opinion was not properly explained, pointing to underlying data taken by Dr. Madsen during his examination of Plaintiff, the Court notes that the ALJ's issue with the report was that Dr. Madsen did not translate his findings into an explanation demonstrating how they were consistent with his opinion. *Brief* [#14] at 25-26.  In other words, the raw data was not demonstrably used as a basis for Dr. Madsen's opinion, thus undermining the reliability of the opinion and leading in part to the ALJ's decision to give the opinion little weight.   Similarly, Plaintiff's disagreement with the ALJ's conclusion that Dr. Madsen's opinion was not consistent with the record as a whole cannot be supported by pointing to a few locations in the record where Dr. Madsen's opinion was in agreement with other physicians. *Brief* [#14] at 26-27. The ALJ properly noted instances where the opinion was not consistent with other points in the record and thus concluded that Dr. Madsen's opinion was not consistent with the record on the whole; the ALJ did not find that the opinion was not consistent with any part of the record at all.  Assessing a medical opinion's consistency is a relevant consideration when deciding what weight to accord an opinion. *See Watkins*, 350 F.3d at 1301; *see also White*, 287 F.3d at 907-08 ("[W]e agree with the district court that [the ALJ] set forth specific and legitimate reasons for discounting the doctor's opinion.  [The ALJ] noted first the discrepancy between Dr. Fanning's very restrictive functional assessment and her

contemporaneous examination of Ms. White . . . .  The ALJ also contrasted the detailed nature of examinations performed by at least one of the consulting doctors with that of Dr. Fanning."); 20 C.F.R. § 416.927(d); SSR 06-03p, 2006 WL 2329939, at *5.

With regard to Dr. Benson's opinion, Plaintiff argues that the ALJ should not have used the fact that Dr. Benson examined Plaintiff only once as a reason to give the opinion little weight.  However, the ALJ was merely noting that he could have given the opinion greater weight had there been more examinations by the same physician over a greater period in order to demonstrate consistency and longevity of Plaintiff's health issues.

Similarly, Plaintiff argues that the ALJ should not have given little weight to the opinion simply because it was rendered prior to Plaintiff's alleged onset date.  However, again, the ALJ was merely noting that the opinion would have deserved more weight had it occurred after Plaintiff's alleged onset date instead of long before, and thus that it was not entitled to significant weight.  Although Dr. Benson's opinion is, as Plaintiff states, one point in time helping to demonstrate a broader longitudinal perspective, the ALJ was noting that Dr. Benson himself had minimal longitudinal perspective on which he could base his opinion.

Next, Plaintiff contests the ALJ's statement that Dr. Benson's opinion was not consistent with Plaintiff's limited treatment.  *Brief* [#14] at 30; *see* 20 C.F.R. § 416.927(c) (stating an ALJ must consider whether an opinion is consistent with the record as a whole).  However, the ALJ was noting that Dr. Benson strongly believed that Plaintiff required treatment for his various problems, but the record shows that Plaintiff has only sought and obtained minimal treatment, thus demonstrating that Dr. Benson's suggestion may have been over-stated.

Finally with regard to Dr. Benson's opinion, Plaintiff takes issue with the ALJ's statement that Dr. Benson failed to cite to specific mental examination findings in formulating his opinion. *Brief* [#14] at 29. Plaintiff cites to the following examination findings provided by Dr. Benson:

> He was able to remember 3 unrelated words immediately but not after 5 minutes. He said he could not do serial 7's or 3's . . . In terms of general fund of information, he did not know in which direction the sun rises, the location of Argentina, or the number of weeks in a year. In terms of abstract reasoning, he was unable to discern the meaning of "Strike while the iron is hot" . . . .

*Id.* (quoting Tr. 245). However, the key here is determining which portion of Dr. Benson's opinion the ALJ referenced and gave little weight. Dr. Benson's opinion, as outlined by the ALJ was that "the claimant had a marked limitation in interacting with the general public, and had a limited ability to perform activities within a schedule and maintain regular attendance due to his anxiety disorder." Tr. 17. There is simply no discernible connection between the mental examination findings cited by Plaintiff and the portion of Dr. Benson's opinion to which the ALJ was referring. As such, the Court finds that Plaintiff's argument on this point fails.

The Court finds that the ALJ specified legitimate reasons for giving little weight to the opinions of Dr. Madsen and Dr. Benson and supported his decisions with citation to the evidence. The ALJ need not "apply expressly" all the relevant factors when determining the weight of a medical opinion, *see Oldham*, 509 F.3d at 1258-5, nor must he formulaically make a detailed analysis of each factor, *see Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). Here, the ALJ's decision was "sufficiently specific to make clear to any subsequent reviewers the weight he gave to the treating source's medical opinion and the reasons for

that weight." *Watkins*, 350 F.3d at 1300 (citing SSR 96-2p). Accordingly, Plaintiff has not directed the Court's attention to error in the ALJ's evaluation of these medical opinions, and the Court does not accept Plaintiff's implied request to reweigh the evidence and substitute its judgment for that of the ALJ.

### 2.    Dr. Suyeishi

Dr. Suyeishi opined that Plaintiff "could perform work that could be learned in up to 3 months and should have limited or no interaction with the public." Tr. 19. The ALJ gave great weight to Dr. Suyeishi's opinion because Dr. Suyeishi had thoroughly reviewed the record, because he is an expert in the evaluation of disability claims, and because the opinion was consistent with the record as a whole. In short, the crux of Plaintiff's argument here is that the ALJ "failed to provide proper reasons for giving more weight to the opinion of Dr. Suyeishi than was given to the opinions of Drs. Madsen and Benson." *Brief* [#14] at 39. However, the Court has already addressed Plaintiff's argument in connection with Dr. Madsen and Dr. Benson and determined that the ALJ did not err by giving those opinions little weight. Although Plaintiff argues that Dr. Suyeishi's opinion should have been given less weight by the ALJ, Plaintiff does not point to any additional reasons why it should have been given less weight than the opinions of Dr. Madsen and Dr. Benson. It is generally true as a matter of law that "the opinion of an agency physician who has never seen the claimant is entitled to" less weight than an examining or treating physician, *Robinson*, 366 F.3d at 1084, but here there are no opinions from treating physicians and the ALJ appropriately largely discounted the opinions of Dr. Madsen and Dr. Benson, who were both examining physicians. Thus, there is no reason in the record why Dr. Suyeishi's opinion should not have been given the weight accorded to it by the ALJ. Contrary to

Plaintiff's assertion, the ALJ was not required to list every instance in the record where Dr. Suyeishi's opinion was consistent with other evidence, and Plaintiff fails to direct the Court's attention to points where Dr. Suyeishi's report is inconsistent with the record in order to undermine the ALJ's determination.

Therefore, the Court finds that the ALJ specified legitimate reasons for giving great weight to the opinion Dr. Suyeishi and properly supported his decision.  As noted, the ALJ need not "apply expressly" all the relevant factors when determining the weight of a medical opinion, *see Oldham*, 509 F.3d at 1258-5, nor must he formulaically make a detailed analysis of each factor, *see Qualls*, 206 F.3d at 1372.  Here, the ALJ's decision was "sufficiently specific to make clear to any subsequent reviewers the weight he gave to the treating source's medical opinion and the reasons for that weight."  *Watkins*, 350 F.3d at 1300 (citing SSR 96-2p).  Accordingly, Plaintiff has shown no error in the ALJ's evaluation of this medical opinion, and the Court does not accept Plaintiff's implied request to reweigh the evidence and substitute its judgment for that of the ALJ.

   **3.     Dr. Valette**

Plaintiff asserts that the ALJ failed to explicitly weigh Dr. Valette's opinion, and so there was no way to review the opinion's impact on the RFC finding.  *Brief* [#14] at 31-33. The ALJ must give consideration to each medical opinion in the record and must discuss the weight he assigns to each opinion. See 20 C.F.R. §§ 416.927(c), 416.927(e)(2)(ii) ("[T]he administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who

do not work for us."). Here, the ALJ discussed Dr. Valette's report "at some length but never explicitly stated whether he found it persuasive or what weight he assigned to it." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162-63 (10th Cir. 2012) (facing a similar issue); Tr. 15-17. However, even assuming that the ALJ erred by not explicitly reciting the amount of weight he gave to Dr. Valette's opinion, the Court finds that this error did not prejudice Plaintiff, and thus that remand is not required. *See Keyes-Zachary*, 695 F.3d at 1162.

"When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened." *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004). Such is the case here: the ALJ did not need to reject or unfavorably weigh Dr. Valette's opinion to determine Plaintiff's RFC. Even had the ALJ given great weight to Dr. Valette's opinion, taken in a light most favorable to Plaintiff's claim, the outcome of Plaintiff's RFC would not have been changed. *See id.* Dr. Valette assessed Plaintiff's GAF score at 60 to 65. Tr. 256. A GAF score of 61-70 indicates "'[s]ome mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational . . . but generally functioning pretty well, has some interpersonal relationships." *Keyes-Zachary*, 695 F.3d at 1162 n.1 (citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000) (emphasis omitted)). The ALJ's RFC determination stated that Plaintiff required "decreased interpersonal contact with the general public, such that he can engage in face-to-face contact (as opposed to telephonic contact) on a less than occasional basis." Tr. 13. Thus, the ALJ developed an RFC consistent with Dr. Valette's findings in some areas and more favorable to Plaintiff than Dr. Valette's findings in other areas. Accordingly, Plaintiff has not shown any prejudice created by the potential error in the ALJ's

failure to explicitly weigh Dr. Valette's medical opinion.

**B.    RFC Determination**

Plaintiff asserts that, even if the ALJ correctly evaluated the medical opinions in the record, the ALJ's RFC findings do not account for the limitations that the ALJ purportedly gave weight.  *Brief* [#14] at 33-37.  The ALJ limited Plaintiff to "decreased interpersonal contact with the general public, such that he can engage in face-to-face contact (as opposed to telephonic contact) on a less than occasional basis." Tr. 13.  As Plaintiff points out, Dr. Suyeishi opined that Plaintiff should have "limited to no interaction with the public." *Id.* at 34 (citing Tr. 64).  However, Plaintiff fails to mention that Dr. Suyeishi's opinion stated in full: "Unless [Plaintiff's] anxiety lessons he should have limited to no interaction with the public."  Tr. 64.

First, the ALJ's RFC determination is well within the range suggested by Dr. Suyeishi.  Plaintiff tries to rewrite Dr. Suyeishi's opinion to state that Plaintiff should have limited interaction with the public sometimes and "at some points" have "no interaction with the general public."  *Brief* [#14] at 34.  But the plain text of Dr. Suyeishi's opinion clearly provides a range of interaction with the public, stating that Plaintiff's job should entail no more than "limited" interaction with the public but could entail no interaction with the public at all.  Tr. 64.  Although slightly different language was used, there is no indication that there is any real difference between Dr. Suyeishi's limited-interaction opinion and the ALJ's less-than-occasional-interaction RFC determination.

Second, the ALJ's RFC determination still accords with Dr. Suyeishi's opinion even if the RFC determination is interpreted to allow slightly more contact with the public.  Dr. Suyeishi allowed for expanded interaction with the public if Plaintiff's anxiety were

lessened.  Tr. 64.  The ALJ noted that, subsequent to Dr. Suyeishi's June 7, 2010 opinion, Plaintiff began taking medication for his anxiety.  Tr. 15.  On December 22, 2011, he was prescribed Xanax and Zoloft, and in April 2012 he reported that the Xanax "really helps." Tr. 287.  Thus, there is evidence in the record and cited by the ALJ to support an RFC determination that allows Plaintiff some contact with the public.

Accordingly, the Court finds that the ALJ did not err in setting the parameters of Plaintiff's RFC as they relate to Dr. Suyeishi's opinion.

## IV.  Conclusion

The record contains substantial evidence from which the ALJ concluded that Plaintiff was not disabled within the meaning of the Act during the time relevant to this case.  The ALJ's decision was based upon substantial evidence and is free of reversible legal error. Accordingly,

IT IS HEREBY **ORDERED** that the decision of the Commissioner is **AFFIRMED**.

IT IS FURTHER **ORDERED** that each party shall bear its own costs and attorney's fees.


Dated:  September 17, 2014

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge